# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| TERESA L. PHELPS, an individual, | Case No. 1:14-CV-0085-EJL-REB |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| CITY OF PARMA, Idaho; CRAIG TELFORD, individually and as Mayor of the City of Parma; ALBERT ERICKSON, individually and as Chief of Police, City of Parma; NATHAN LEIGH, individually and as Council Member, City of Parma; ONEY EGUIA, individually and as Council Member, City of Parma; ANGIE LEE, individually and as Council Member, City of Parma; TOM SMITH, individually and as Council Member, City of Parma. | |
| Defendants. | |

This matter is before the Court on Defendants' Motion for Summary Judgment (Dkt. 22). The parties have submitted their briefing on the motion and the matter is now ripe for the Court's review. Having fully reviewed the record herein, the Court finds the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the motion shall be decided on the record before this Court without oral argument.

1

# BACKGROUND[1]

Plaintiff Teresa Phelps ("Ms. Phelps") was employed as a City Clerk by Defendant City of Parma (the "City") for twenty-two years.  Each year throughout her twenty-two years as City Clerk, Ms. Phelps was reappointed for a one-year term through nomination by the Mayor and approval by the City Council. Ms. Phelps' one-year appointment for 2013 expired in January, 2014.  At that time, a new mayor, Bob Flowers ("Mayor Flowers"), had just taken office.  Although Mayor Flowers nominated Ms. Phelps for appointment at the January 14, 2014 City Council meeting, a majority of the City Council voted against Ms. Phelps' reappointment.[2]

As City Clerk, Ms. Phelps' duties included preparing monthly payroll and preparing all monthly, quarterly and annual payroll reports.  At some point in late 2012, while she was processing the W-2 tax forms for city employees, Ms. Phelps discovered that the City had employed more than four police officers for most of the year.  Ms. Phelps was concerned because the Fair Labor Standards Act, 29 U.S.C. § 201 *et. seq*. ("FLSA"), requires law enforcement to be paid time-and-a-half wages on overtime, instead of straight time, when more than four police officers are employed.[3]  Ms. Phelps

---

[1] Unless otherwise noted, the following facts are undisputed.

[2] City Council member defendants Nathan Leigh, Oney Eguia, Angie Lee and Tom Smith each voted against Ms. Phelps' appointment.  The remaining two City Council members, Keith Vickers and Jim Smith, voted in favor of her appointment.

[3] Under § 213(a)(20) of the FLSA, a law enforcement agency is exempt from the FLSA's minimum and maximum hour requirements  if it "employs during the workweek less than 5 employees[.]"

was also troubled that the City was calculating vacation and sick leave hours to count towards overtime, and believed paying police department employees overtime in addition to their salary violated the FLSA.

Ms. Phelps reported the suspected violations to then Mayor Craig Telford ("Mayor Telford"). Mayor Telford instructed Ms. Phelps to convert police department employees' salaries to an hourly rate and to pay overtime hours as set by the FLSA. Ms. Phelps contacted the City Auditor and the Department of Labor to confirm the correct method to use to convert non-exempt salary to non-exempt hourly. Ms. Phelps also contacted the City Attorney regarding the payment of holiday pay, and was directed to change the practice so holiday and sick leave were not calculated towards overtime pay.[4] The City Attorney also instructed Ms. Phelps to begin paying police officers time-and-a-half overtime, which she had not previously paid, and to compensate them for accrued overtime which had not previously been paid. Ms. Phelps initially refused to pay police officers for the previously accrued overtime, but ultimately complied after being directed to do so during an executive session of the City Council.[5] All of the issues about the

---

[4] Initially, the Mayor and the City Council approved the practice of paying eight extra hours for each holiday. This practice was discontinued after further investigation by the City Attorney.

[5] There was an additional issue regarding the calculation of the pay rate by which the police department received their overtime wages. Prior to 2013, when the police officers received only straight pay, their pay was calculated at a rate of 160 hours per pay period. However, because the FLSA exemption allows police officers to work at straight pay until 171 hours per pay period, and then to receive overtime pay above 171 hours, Ms. Phelps divided the officers' annual wages by the 171 hour pay period, instead of 160 hours, when she began paying them overtime in early 2013. This led to an artificial (Continued)

police payroll and purported FLSA violations were resolved by April 2013.  (Dkt. 26-5, Phelps Depo., p. 26, p. 95.)

After the extra holiday/leave pay was discontinued, various police officers raised informal complaints about no longer receiving that pay.  In an executive session on June 14, 2013, Chief of Police Albert Erickson ("Chief Erickson") complained to the City Council about the police department's decrease in pay.  During that meeting, Chief Erickson stated Ms. Phelps did not understand the FLSA, had incorrectly calculated several officers' checks, had a negative attitude, and had caused many problems between City employees by, among other things, bad-mouthing Mayor Telford and others.[6]  Chief Erickson presented a memo detailing the aforementioned complaints against Ms. Phelps. (Dkt. 1, Exhibit A.)  In the memo, Chief Erickson questioned "the veracity of the figures"

_____

decrease in their pay rate.  Based on this decrease, the police department complained, and after further review with the City Attorney, Mayor Telford told Ms. Phelps to calculate the officers' hourly rate at the 160 hour pay period.  Ms. Phelps doubted this was the correct calculation, and initially refused pay the police department in the manner directed by Mayor Telford.  She later complied after she was directed to do so by the City Attorney.

[6] Chief Erickson also complained to the City Council about a separate, Idaho Department of Transportation ("IDT") grant issue he perceived to have been caused by Ms. Phelps' failings in May, 2013.  During an open session of the City Council in May 2013, Chief Erickson blamed Ms. Phelps for the loss of salary reimbursements from an IDT grant he had applied for in August 2012. (Dkt. 26-3, Exhibit N, Parma Police Department Monthly Report) (stating "[d]ue to an inability or unwillingness on the part of our payroll department to give the State the figures they need we've lost reimbursement on those mobilizations, totaling $3200.00 the City missed out on.")  The parties dispute both whether Ms. Phelps was responsible for the loss of the IDT grant and whether the grant issue is relevant to this case.

4

Ms. Phelps used to calculate payroll, and made many inflammatory comments about her conduct.  (*Id*., p. 5.)  The memo was given to Mayor Telford, City Council members, the City attorney, and Ms. Phelps.  All in attendance at the executive session left with a copy of the memo.

Several months later, on October 9, 2013, Mayor Telford and the City Attorney met with Ms. Phelps and advised her that she would not receive a raise.  Ms. Phelps contends Mayor Telford told her she was not receiving a raise because of the police department payroll issue.  However, Mayor Telford set forth the purported reasons for the denial of Ms. Phelps' raise in a disciplinary letter. During the October 9, 2013 meeting, Ms. Phelps read and refused to sign the letter, stating it contained false accusations. Although the City Attorney tore the letter up and represented it would not be placed in Ms. Phelps file, Defendants produced a copy of the letter during Ms. Phelps' deposition. (Dkt. 26-1, p. 10, n. 1; Dkt. 22-5.)  Other than a vague reference to recent disagreement between himself and Ms. Phelps regarding the law, Mayor Telford's disciplinary letter did not mention either the payroll issue or any of Chief Erickson's complaints with Ms. Phelps.[7]

Mayor Telford was defeated in the November, 2013 election by Mayor Flowers. At the City Council meeting on January 13, 2014, Mayor Flowers was sworn in and made

_____

[7] Specifically, the letter states, "[w]hile we both may not agree on an approach to a city matter or the interpretation of the law, Ms. Phelps needs to address the issue in a productive manner, researching the issue to provide the best information and work with me to talk to other persons who may have the answers or be affected by the issue to reach the best solution."  (*Id*.)

his selections for the appointed positions for the city.  Both Ms. Phelps and the prior City

Building Inspector were rejected by a majority vote of the City Council.  Ms. Phelps

believed her employment as City Clerk was terminated as retaliation for complying with

the FLSA, and filed the instant suit.  Since she was denied reappointment in January,

2014, Ms. Phelps has applied, but been rejected, for a number of city clerk or similar

positions.

## STANDARD OF REVIEW

Motions for summary judgment are governed by Rule 56 of the Federal Rules of

Civil Procedure. Rule 56 provides, in pertinent part, that judgment "shall be rendered

forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c).

The Supreme Court has made it clear that under Rule 56 summary judgment is

mandated if the non-moving party fails to make a showing sufficient to establish the

existence of an element which is essential to the non-moving party's case and upon which

the non-moving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986).  If the non-moving party fails to make such a showing on any

essential element, "there can be no 'genuine issue of material fact,' since a complete

failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.[8]

Moreover, under Rule 56, it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine."  An issue is "material" if it affects the outcome of the litigation.  An issue, before it may be considered "genuine," must be established by "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat'l Bank v. Cities Serv. Co. Inc.*, 391 U.S. 253, 289 (1968)).  The Ninth Circuit cases are in accord. *See, e.g., British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 883 F.2d 371 (9th Cir. 1989).  According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party:

> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*Id*. at 374 (citation omitted).

---

[8] *See also,* Rule 56(3) which provides, in part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Of course, when applying the above standard, the court must view all of the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986); *Hughes v. United States*, 953 F.2d 531, 541 (9th Cir. 1992).

## ANALYSIS

Ms. Phelps brings three causes of action against the City, Mayor Telford, Chief Erickson and City Council members Nathan Leigh ("Leigh"), Oney Eguia ("Euigia"), Angie Lee ("Lee") and Tom Smith ("Smith") (collectively referred to hereinafter as "Defendants"). Each of the individual defendants are sued both in their official and individual capacities. Defendants seek summary judgment on each of Ms. Phelps' claims.

### A. 42 U.S.C. § 1983

Congress has created a cause of action against individuals who, while acting under color of law, violate the constitutional rights of private citizens. Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivations of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured[.]

42 U.S.C. § 1983.

"Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to actions by state and local officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006)

(citing *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 978 (9th Cir. 2004)).  "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights."  *Id*. (citation omitted).

To establish a prima facie case under 42 U.S.C. § 1983, a plaintiff "must adduce proof of two elements: (1) the action occurred 'under color of law' and (2) the action resulted in a deprivation of a constitutional right or a federal statutory right."  *Souders v. Lucero*, 196 F.3d 1040, 1043 (9th Cir.1999) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)).  Paragraphs 7-13 of the complaint allege that Defendants acted under color of state law.  Paragraphs 62-72 allege Defendants' actions deprived Ms. Phelps of her Fourteenth Amendment due process rights.  "The procedural due process guarantees of the Fourteenth Amendment apply only when a constitutionally protected liberty or property interest is at stake."  *WMX Technologies, Inc. v. Miller*, 80 F.3d 1315, 1318 (9th Cir. 1996) (citing *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972)).

In *Paul v. Davis*, 424 U.S. 693, 701 (1976), the Supreme Court held that the infliction by state officials of a stigma to one's reputation is not itself sufficient to invoke the procedural protection of the Due Process Clause of the Fourteenth Amendment. Instead, in addition to the stigma inflicted to one's reputation, one must also allege the distinct alteration or extinction of a previously recognized right or status.  *Id*. at 711. This has become known as the "stigma-plus" test.  *WMX Technologies*, 80 F.3d at 1319. Previously "recognized rights" attain constitutional status "by virtue of the fact that they have initially recognized and been protected by state law."  *Paul*, 424 U.S. at 710.  Stated another way, property or liberty interests warranting constitutional protection are "not

created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law— rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577.

Ms. Phelps alleges Defendants infringed upon her liberty interests in her good name and reputation, in continued and future employment, and right to a pay raise, when they terminated her and made stigmatizing allegations regarding her job performance. (Dkt. 1,¶¶ 62-73; Dkt. 26, pp. 8-9.)  As a result of the purportedly false allegations made by Chief Erickson in his May and June 2013 statements to the City Council, and by Mayor Telford in his October 2013 disciplinary letter denying Ms. Phelps a pay raise, Ms. Phelps claims a stigma has been placed on her professional reputation and that her future employment opportunities within her chosen profession have been adversely impacted and/or foreclosed.   Defendants argue Ms. Phelps' liberty interest claim fails because she cannot establish extinction of a recognized right or status since she was never terminated.  Instead, Ms. Phelps' term of appointment for the year of 2013 had already ended prior to the City Council's decision to reject Ms. Phelps' appointment in 2014.

Ms. Phelps responds that she was improperly "terminated" due to the City Council's failure to follow the procedure specified in I.C. § 50-206.  Ms. Phelps contends her appointment was continuing and was not for a fixed term, and claims she expected to continue in her position until retirement.  (Dkt. 26, p. 7.)  Because her term was purportedly continuing, Ms. Phelps argues that the City had to follow the procedure outlined in I.C. § 50-206 in order to remove her.  Section 50-206 provides:

> Any appointed officer . . . may be removed by the mayor for any cause by him deemed sufficient; but such removal shall be by and with the affirmative vote of one half (1/2) plus one (1) of the members of the full council; provided, that the city council, by unanimous vote of all of its members, may upon their own initiative remove any appointed officer.

*Id*.

Ms. Phelps suggests Defendants violated I.C. § 50-206 because Mayor Flowers voted to appoint her and the City Council did not unanimously vote to remove her.  (Dkt. 26, p. 7.)  Because the City Council did not follow the procedures of I.C. § 50-206, Ms. Phelps contends Defendants violated the procedural safeguards mandated by the Idaho legislature and improperly removed or terminated her.

Defendants concede that Ms. Phelps was not removed pursuant to I.C. § 50-206.  However, Defendants contend they were not required to follow the § 50-206 procedure to remove Ms. Phelps because she was not appointed at the time of the City Council's vote.  Defendants distinguish between removal of an appointed officer, which requires compliance with I.C. § 50-206, and failure to appoint (or reappoint) an officer, which instead requires compliance with I.C. § 50-204.  Section 50-204 of the Idaho Code provides the mayor, "except as otherwise provided . . . with the consent of the council shall appoint a city clerk . . . and such other officers as may be deemed necessary for the efficient operation of the city."  I.C. § 50-204.  At the time the City Council rejected Ms. Phelps' appointment, Mayor Flowers was newly elected.  Although Mayor Flowers nominated Ms. Phelps for appointment, the majority of the City Council did not approve the appointment.  Defendants argue Ms. Phelps was not "terminated" in violation of Idaho statute because the City Council's failure to appoint Ms. Phelps was permitted

11

under I.C. § 50-204.  Further, Defendants note the Parma City Code indicates that the City Clerk shall retain office "for the term of . . . appointment unless sooner removed." (Dkt. 22-14.)  Section 50-205 of the Idaho Code also states that "appointive officers" are appointed for a specific term, providing, "[w]henever a vacancy shall occur in an appointive office, the vacancy for the *unexpired term* shall be filled by appointment in the same manner as the original appointment.  I.C. § 50-205 (emphasis added). Defendants suggest Ms. Phelps was not terminated because her latest one-year term had already ended when the City Council voted against her appointment.

The interpretation of a statute is a question of law over which the court exercises free review.  *State v. Hart*, 25 P.3d 850, 852 (Idaho 2001).  The purpose of statutory interpretation is to give effect to legislative intent.  *State v. Yzaguirre*, 163 P.3d 1183, 1187 (Idaho 2007) (citing *Robison v. Bateman–Hall Inc*., 76 P.3d 951, 954 (Idaho 2003)). The literal words of the statute provide the best guide to legislative intent; therefore, the interpretation of a statute must begin with the literal words of the statute.  *Id*.  "In determining the ordinary meaning of a statute 'effect must be given to all the words of the statute if possible, so that none will be void, superfluous, or redundant.' " *State v. Mercer*, 138 P.3d 308, 309 (Idaho 2006) (quoting *In re Winton Lumber Co*., 63 P.2d 664, 666 (Idaho 1936)). Moreover, the Court must consider all sections of applicable statutes together to determine the intent of the legislature. *Davaz v. Priest River Glass Co., Inc*., 870 P.2d 1292, 1295 (Idaho 1994).

Here, the plain meaning of the relevant statutory provisions suggest I.C. § 50-206 did not apply to Ms. Phelps' situation.  First, as noted, I.C. § 50-205 expressly refers to a

"term" of office for appointed officers.  Finding Ms. Phelps' appointment was continuing and not fixed would render § I.C. 50-205's reference to a "term" of employment meaningless.  In addition, in Ms. Phelps' case, because she was appointed by Mayor Telford in January 2013 for a one-year term of appointment, it follows that Mayor Telford, or the City Council by unanimous vote, had the authority to remove her during this term under I.C. § 50-206 "if sooner desired."  However, once Mayor Telford's term ended, Mayor Flowers, as the newly elected mayor, could appoint his own city clerk through I.C. § 50-204.  This section gives the mayor the authority, with the consent of the city council, to appoint a city clerk.  Under Ms. Phelps' reading of the statute, Mayor Flowers would be without such authority because a previous mayor had already appointed Ms. Phelps to a continuing position.  This reading would render § 50-204 void because Mayor Flowers would not have the authority to appoint a city clerk.

Moreover, Ms. Phelps admitted in her deposition both that she had been re-appointed every year throughout her twenty-two years with the City, and that she understood her latest appointment lasted only through January 2013.  (Dkt. 26-5, Phelps Depo., p. 5.)  Ms. Phelps' claim that her appointment was not for a fixed term is belied by this admission.  Finally, the Idaho Supreme Court has interpreted §§ 50-204 and 50-206 as "clear and unambiguous that appointive officers are at-will and subject to removal without cause."  *Boudreau v. City of Wendell*, 213 P.3d 394, 397 (Idaho 2009).  Although, under *Boudreau*, an appointed officer may be removed without notice and a hearing only where the mayor and the majority of the city council vote for removal, or where the city council unanimously votes to remove the city clerk, this holding only

13

applies only to "appointive officers." *Id*. (citing I.C. § 50-206).  At the time the City

Council voted against Ms. Phelps' appointment, her prior appointment for the 2013 year

had already ended and she did not have an "appointive" position to be removed from.

Thus, the City Council was not required to comply with § 50-206, and did not violate any

procedural safeguards set by the Idaho legislature in rejecting Ms. Phelps' appointment. [9]

    Ms. Phelps suggests that her liberty interest was also implicated by Mayor

Telford's failure to give her a raise in conjunction with this October 2013 disciplinary

letter.  Ms. Phelps argues a "liberty interest is implicated by more than termination and

includes an alteration of a right or status such as employee's range, pay or privileges" and

contends depriving her of a "raise based upon false, stigmatizing charges is an alteration

of status protected by due process."  (Dkt. 26, pp. 8-9) (citing *Stiesberg v. California*, 80

F.3d 353, 356 (9th Cir. 1996)).  In *Stiesberg*, plaintiff highway patrol officer brought a

§ 1983 claim stating his transfer to a less desirable department deprived him of protected

liberty or property interests without due process of law.  In conjunction with the transfer,

plaintiff alleged defendants damaged his reputation by accusing him of lying and

incompetence.  *Id*. at 357.  The Ninth Circuit rejected this claim, holding:

> In the absence of any allegation or showing that he had a *right* not to be
> transferred or subjected to petty annoyances on the job, and/or that the conduct
> complained of amounted to a constructive demotion or discharge, Stiesberg's
> contention that the [defendants] failed to comply with the requisite administrative
> steps prior to transferring him amounts to little more than a complaint that his

---

[9] The *Boudreau* Court held a city cannot override legislative intent by devising its own policies or procedures.  *Id*.  Here the City did not seek to override the statutory language of § 50-206 but instead complied with § 50-204.

unilateral expectations were not met.  Such unilateral expectation, without more, does not involve any federally cognizable liberty or property interest.

*Id*. at 357 (citations omitted) (emphasis added).

Similarly, Ms. Phelps has not made any showing that she had a right to a raise.  To have a constitutionally protected property or liberty interest, "a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Roth*, 408 U.S. at 577.  Even if Ms. Phelps anticipated a raise, any expectation was simply that, and nothing more.  Although perhaps a deduction in salary would constitute an alteration in status sufficient to implicate a liberty interest, here Ms. Phelps's pay was not reduced.  Instead, she was simply denied an increase in pay.[10]  Ms. Phelps has not identified any state statute that could support her entitlement to a raise.

Nor has Ms. Phelps identified any independent source to establish either that she was entitled to a raise or that the failure to give her a raise was outside of Mayor Telford's discretion as her supervisor.  The only evidence Ms. Phelps offers to suggest she was entitled to a raise is the fact that she had "prior stellar performance reviews." (Dkt 26, p. 9.)  Ms. Phelps included performance reviews for 2010, 2011 and 2012 with

---

[10] Ms. Phelps cites *Vanelli v. Reynolds School Dist. No. 7*, 667 F.2d 773 (9th Cir. 1982) in support of her claim that a liberty interest is implicated if a public statement impairing an employee's reputation for honesty or morality is made in connection with the alteration of some right or status recognized by state law.  (Dkt. 26, p. 8.)  In *Vanelli*, the Ninth Circuit determined plaintiff teacher's liberty interest was implicated when he was dismissed mid-year for "immoral conduct."  Unlike Ms. Phelps, plaintiff in *Vanelli* had a property interest in his continued employment and was terminated.  "Under these principals," plaintiff's dismissal implicated a protectable liberty interest.  *Id*. at 778.

her opposition to Defendants' Motion for Summary Judgment.  The Court notes such reviews are not necessarily "stellar," as Ms. Phelps was frequently rated "satisfactory," as opposed to "exceed expectations" or "significantly exceeds expectations," and had several negative comments such as "does not handle stress well at times," "stop yelling," "tends to holler and yell instead of just talking out problems," and "sometimes grumpy when not necessary."  (Dkt. 26-3, Exhibit S).  Regardless, even if her evaluations are considered "stellar," Ms. Phelps has not provided any evidence or argument to establish she was entitled to a raise as a result of such evaluations.  As such, Mayor Telford's refusal to award Ms. Phelps a salary increase in 2013 did not cause a change in Ms. Phelps' rights or status sufficient to trigger Fourteenth Amendment protection.  *Davis*, 424 U.S. at 711.

Due process is implicated when, in connection with termination or alteration of status, a public employer makes a charge that may seriously damage the employee's standing and association in the community, or impose a stigma foreclosing other employment opportunities.[11]  *Campanelli v. Bockrath*, 100 F.3d 1476, 1478 (9th Cir. 1996).  To establish such a stigma, the employee must show (1) a stigmatizing statement that seriously damages a person's reputation or significantly forecloses his freedom to take advantage of other employment opportunities; (2) that the stigmatizing statement

---

[11] "In the specific context of terminations, 'where a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.'"  *Anderson v. Spaulding*, 50 P.3d 1004 (Idaho 2002) (quoting *Roth*, 408 U.S. at 573).

was made with a temporal nexus to the course of termination; and (3) that the stigmatizing statement was substantially false.  *Id*. at 1479; *see also Bollow v. Federal Reserve Bank of San Francisco*, 650 F.2d 1093, 1101 (9th Cir. 1981).  Although Ms. Phelps contends her ability to establish each of the aforementioned elements depends upon disputed issues of material fact warranting denial of Defendants' Motion for Summary Judgment, the Court need not further address Ms. Phelps' liberty interest claim because she was not terminated and has not identified any law or facts to establish she was entitled to a raise.  As such, Ms. Phelps fails to meet the "stigma-plus" test because she did not suffer a "'distinct alteration or extinction' of a previously recognized right to add to [her] alleged stigmatization."  *WMX Technologies*, 80 F.3d at 1320 (quoting *Paul*, 424 U.S. at 711).  Defendants are accordingly entitled to summary judgment on Ms. Phelps' § 1983 claim.

## B.  Violation of the FLSA

Ms. Phelps claims Defendants retaliated against her for notifying Mayor Telford that the police department was being overpaid and that the payment of overtime violated the FLSA.  The FLSA anti-retaliation provision provides that it is unlawful:

> [T]o discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or cause to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3).

The elements of a retaliation claim under the FLSA require a showing that a plaintiff (1) engaged in activity protected under the FLSA, (2) suffered a materially

adverse employment action, and (3) a causal connection between the activity and the adverse action. *E.E.O.C. v. Luce, Forward, Hamilton & Scripps*, 303 F.3d 994, 1004-05 (9th Cir. 2002). The burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), has been adapted and applied to cases under the FLSA. *See, e.g., Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir. 2008) (citations omitted). Under this framework, once a plaintiff makes a prima facie case of retaliation, the defendant must then articulate a legitimate, non-retaliatory reason for its decision. *Id.* If the defendant can articulate such reason, the burden then shifts to the plaintiff to demonstrate the proffered reason is a pretext for retaliation. *Id.*

Here, Defendants admit a reasonable jury could find Mayor Telford's failure to give Ms. Phelps a raise in October 2013 was a materially adverse employment action related to Ms. Phelps' FLSA complaints due to Mayor Telford's purported statement that he denied Ms. Phelps a raise because of the problems with the police department and payroll. (Dkt. 22-1, p. 14.) Although Defendants dispute that the raise issue was a retaliatory action and argue it was rather a response to Ms. Phelps' poor performance, Defendants focus on Ms. Phelps' inability to meet the first element of a prima facie retaliation claim.

Defendants argue Ms. Phelps' conduct was not "protected conduct" under the FLSA because she never had to "step outside the role" of her employment and never "[took] a position adverse to the employer." (Dkt. 22-1, p. 12) (citing *Hagan*, 529 F.3d at 627). In *Hagan*, plaintiff field service manager ("Hagan") was in charge of a small group of technicians. 529 F.3d at 620. Hagan admitted that the calculation of his technicians'

18

overtime hours was part of his job as field service manager.  When Hagan's employer

changed the technicians' schedule in a manner that would impact the amount of overtime

they could receive, Hagan voiced internal objections and concerns to management about

the possibility of field technicians receiving less overtime pay.  The Fifth Circuit held

Hagan's complaints did not constitute protected activity under the FLSA because Hagan

never had to "step outside his role" as a field manager, either to complain on behalf of the

technicians or to complain on his own behalf, about a supposed violation of the FLSA.

*Id*. at 625, 627 (citing *McKenzie v. Renberg's Inc.*, 94 F.3d 1478 (10th Cir. 1996)).

Moreover, voicing his technicians' concerns was "not only *not adverse* to the company's

interests, it is exactly what the company *expects* of a manager."  *Hagan*, 529 F.3d at 628

(emphasis in original).

Several circuits have held an employee does not engage in protected activity under

the FLSA unless that employee somehow steps outside his normal job role and takes an

action adverse to the employer.  *Id*. at 627; *see also McKenzie*, 94 F.3d at 1486; *Claudio-*

*Gotay v. Becton Dickinson Caribe, LTD*, 375 F.3d 99 (1st Cir. 2004*); Brush v. Sears*

*Holdings Corp.*, 466 Fed.Appx. 781 (11th Cir. 2012) (unpublished) (applying the rule in

a Title VII case); *EEOC v. HBE Corp.*, 135 F.3d 543 (8th Cir. 1998) (same).  In

*McKenzie*, the Tenth Circuit described this requirement as follows:

> Despite our expansive interpretation of § 215(a)(3), we have never held that an
> employee is insulated from retaliation for participating in activities which are
> neither adverse to the company nor supportive of adverse rights under the statute
> which are asserted against the company. . . . [I]t is the assertion of statutory rights
> (i.e., the advocacy of rights) by taking some action adverse to the company—via
> formal complaint, providing testimony in an FLSA proceeding, complaining to

superiors about inadequate pay, or otherwise—that is the hallmark of protective activity under § 215(a)(3).

94 F.3d 1486.

The *McKenzie* Court held that plaintiff personnel director's ("McKenzie") act of reporting her good faith concerns about the company's wage and hour violations was not sufficient to trigger the protections of § 215(a)(3) because McKenzie was not asserting any rights under the FLSA but rather was performing her duties as personnel director for the company.  *Id.*  In so holding, the Court explained:

> Here, McKenzie never crossed the line from being an employee merely performing her job as personnel director to an employee lodging a personal complaint about the wage and hour practices of her employer and *asserting* a right adverse to the company.  McKenzie did not initiate a FLSA claim against the company on her own behalf or on behalf of anyone else.  Rather, in her capacity as personnel manager, she informed the company that it was at risk of claims that might be instituted by others as a result of its alleged FLSA violations.  In order to engage in protected activity under § 215(a)(3), the employee must step outside his or her role of representing the company and either file (or threaten to file) an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA.  Here, McKenzie did none of these things.  Indeed, McKenzie testified that her job responsibilities included participating in wage and hour issues. . . . McKenzie therefore lacks an essential ingredient of a retaliation claim; that is, she did not take a position adverse to her employer or assert any rights under the FLSA.  Accordingly, McKenzie did not engage in activity protected under § 215(a)(3)[.]

*Id*. at 1486-87 (emphasis in original).

Defendants argue Ms. Phelps similarly never crossed the line from an employee merely performing her job as City Clerk to an employee lodging a personal complaint about the wage and hour practices of the City and asserting a right adverse to the City. Defendants suggest Ms. Phelps, as City Clerk, had the responsibility to verify that payroll

was executed pursuant to applicable law.  (Dkt. 22-1, p. 13) (citing Ms. Phelps'
deposition testimony stating she was in charge of reviewing and approving all payments
made by the City, including overseeing payroll).  Defendants contend Ms. Phelps learned
she had been inaccurately calculating police department overtime and reported this to
Mayor Telford as a part of her job duties.  (*Id*.)  Defendants note Mayor Telford and the
City Attorney then investigated the situation and specifically told Ms. Phelps to correct
her prior errors and pay the police officers in accordance with the FLSA.  (*Id*.)

Ms. Phelps responds that the Ninth Circuit "has not addressed the issue of
'…whether an employee must step outside his or her professional role and take a role
adverse to the employer in order to engage in protected activity under 215(a)(3).'"  (Dkt.
26, p. 16) (quoting *Stewart v. Masters Builders Ass'n of King Cnty.*, 736 F.Supp.2d 1291,
1298 (W.D. Wash. 2010)).  Additionally, Ms. Phelps claims she does not admit or allege
that her role as City Clerk is to ensure compliance with the FLSA, and claims her role as
City Clerk was not to execute payroll according to applicable law, but was instead to
prepare payroll which the Mayor and other department heads then approved.  (*Id*., pp. 16-
17.)

Although not mentioned by the parties, the Supreme Court established a "fair
notice" test for deciding whether an employee has "filed any complaint" under the anti-
retaliation provision of the FLSA in *Kasten v. Saint-Gobain Performance Plastics Corp*.,
563 U.S. 1 (2011).  Under the "fair notice" test, to fall within the scope of the anti-
retaliation provision, a "complaint must be sufficiently clear and detailed for a reasonable
employer to understand it, in light of both content and context, as an assertion of rights

protected by the statute and a call for their protection." *Id*. at 14.  In establishing the "fair notice" test, the Supreme Court noted that the FLSA, as a remedial statute, must be interpreted broadly in favor of employees, but also that the FLSA seeks to establish an enforcement system that is fair to employers.  *Id*. at 13-14.  Thus, the employer must have fair notice that an employee is making a complaint that could subject the employer to a later claim of retaliation.  *Id*. at 15; *see also Lambert v. Ackley*, 180 F.3d 997, 1007 (9th Cir. 1999) ("[N]ot all amorphous expressions of discontent related to wages and hours constitute complaints filed within the meaning of § 215(a)(3).").

Two months after the briefing on Defendants' Motion for Summary Judgment was complete, the Ninth Circuit addressed whether the "stepping outside role" requirement of *Hagan*, *McKenzie*, and other circuit cases applies in this circuit.  In *Rosenfield v. GlobalTranz Enterprises, Inc*., 811 F.3d 282, 287 (9th Cir. 2015), the Ninth Circuit held the latter cases "correctly recognized both that a manager may, in some circumstances, file a complaint under § 215(a)(3) and that an employee's managerial position is an important contextual element that must be considered when assessing whether the employee has filed a complaint." *Id*. (citing *Hagan*, 529 F.3d at 627-28; *Claudio-Gotay*, 375 F.3d at 102; *McKenzie*, 94 F.3d at 1486-87).  While noting the rule of such cases and the "fair notice" rule of *Kasten* "are likely consistent," the Court found it "unnecessary to weigh in definitively on that question."  *Rosenfield*, 811 F.3d at 287.  Instead, the Court adopted the "fair notice" rule of *Kasten*, explaining:

> 'To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light

of both content and context, as an assertion of rights protected by the statute and a call for their protection.'

The employee's job title and responsibilities—in particular, whether he or she is a manager—form an important part of that 'context.'  Generally speaking, managers are in a different position vis-à-vis the employer than are other employees because . . . their employer expects them to voice work-related concerns and to suggest changes in policy to their superiors.  That may be particularly true with respect to upper-level managers who are responsible for ensuring compliance with the FLSA.

If an entry-level employee reported that someone is underpaid in violation of the FLSA and requested that the employee be compensated in compliance with the Act, a reasonable employer almost certainly would understand that report as a 'complaint' (depending, of course, on all the circumstances).  *But if the identical report were made by a manager tasked with ensuring the company's compliance with the FLSA, a reasonable employer almost certainly would not understand that report as a 'complaint' (again, depending on all the circumstances).  Rather, the employer naturally would understand the manager's report as carrying out his or her duties.*  In short, when determining whether an employee has 'filed any complaint,' the employee's role as a manager often is an important contextual element.

*Id*. at 286, 287 (citing *Kasten*, 563 U.S. at 14) (emphasis added).

The Ninth Circuit held that a fact issue existed as to whether the employee in

*Rosenfield* engaged in protected activity under the FLSA, and reversed the lower court's

grant of summary judgment for defendant employer.  In so holding, the Court noted that

plaintiff ("Rosenfield") served as Manager or Director of Human Resources throughout

her tenure with defendant employer.  Because a person with such titles "generally is

tasked with employment-related decisions, reports on a company's compliance with

employment related statutes ordinarily *would not* put the employer on notice that the

manager was filing a complaint within the meaning of § 215(a)(3)."  *Id*. at 288 (emphasis

added).  However, Rosenfield "critically" provided evidence that ensuring compliance

23

with the FLSA was *not* her responsibility.  *Id.*  Rosenfield's boss testified that he
"considered himself solely responsible for FLSA compliance" and "did not understand,
appreciate, or welcome [Rosenfield's] bringing to his attention the FLSA violations." *Id*.
Despite this arrangement, Rosenfield complained orally to management on at least eight
occasions that the company was not in compliance with the FLSA, provided copies of the
statute on some occasions, along with specific assertions concerning misclassification of
a large number of employees and requests for changes in in payment of wages for those
employees, and raised the subject of FLSA violations in at least twenty-seven weekly and
monthly reports to her superiors.  *Id*.  Although Rosenfield's boss agreed to take some
actions aimed at addressing her FLSA complaint, he "made clear to [Rosenfield]…that he
did not want or expect [her] to determine whether the company was implementing" those
changes.  *Id*.   Rosenfield later discovered that the company was not implementing the
changes.  She documented the company's non-compliance with the FLSA and
complained again to her boss. She was fired five days later.

        In light of the substantial evidence establishing ensuring FLSA compliance was
*not* a part of Rosenfield's job, the Ninth Circuit held her "advocacy for the rights of
employees to be paid in accordance with the FLSA could not reasonably have been
understood…merely to be a part of [Rosenfield's] regular duties."  *Id*.  The Court
accordingly reversed summary judgment for employer, finding a genuine issue of
material fact existed as to whether Rosenfield's reports of FLSA violations reached the
requisite degree of formality to constitute protected activity under the FLSA.

Here, by contrast, Ms. Phelps claims, without citation to the record, that ensuring compliance with the FLSA was not a part of her role as City Clerk.[12]  (Dkt. 26, p. 16.) While the Court must make all justifiable inferences in Ms. Phelps' favor for purposes of summary judgment, it need not credit mere assertions without any evidentiary support. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248  (1986) (to raise an issue for trial, the nonmoving party must present more than a mere scintilla of evidence, and must come forward with evidence sufficient to show that a reasonable jury could return a verdict in its favor).  Moreover, the evidence in the record overwhelmingly suggests that ensuring compliance with the FLSA was a part of Ms. Phelps' duty as City Clerk, that Ms. Phelps and Mayor Telford both viewed her role as such, and that Ms. Phelps' reports did not constitute an assertion of rights protected by the statute.

For instance, Ms. Phelps was responsible for reviewing and approving all payments made by the City, including that of overseeing payroll.  (Dkt. 26-5, Phelps Depo., p. 29, p. 30.)  While calculating payroll, Ms. Phelps testified she "tried to follow the law and do what was right and proper for the City."  (*Id*., p. 33.)  When she noticed the police department was employing more than four police officers but had not been paying time-and-a-half overtime, and that sick and holiday leave hours had been counted

---

[12] In support of this assertion, Ms. Phelps cites only to her Statement of Disputed Facts, paragraph 1.  This paragraph states "[a]s City Clerk/Treasurer. Ms. Phelps duties included preparing monthly payroll, twice a month, preparing all monthly quarterly, and annual payroll reports."  (Dkt. 26-1, ¶ 1.)  Although this statement lists Ms. Phelps duties, it says nothing about whether or not she was required to prepare payroll in compliance with the law.

towards overtime, she reported the potential FLSA violations to Mayor Telford and to the City Attorney in late 2012 or early 2013.  (*Id*., pp. 21-22; pp. 28-29.)

With respect to the improper calculation of counting vacation and sick leave towards overtime pay, the City Attorney directed Ms. Phelps to change the practice so vacation and sick leave was not counted towards overtime pay, and the issue was corrected.  (*Id*., pp. 30-32.)  Although Chief Erickson complained to the City Council about the change in overtime pay, Ms. Phelps continued to pay the police officers without the miscalculation for holiday pay, and was never directed to do otherwise by Mayor Telford.  (*Id*., p. 32-34.) With respect to the time-and-a-half overtime pay issue, Mayor Telford and the City Attorney also instructed Ms. Phelps to begin paying the police officers time-and-a-half, which she had previously not paid to them, and to compensate them for recorded overtime that had not previously been paid.  (Dkt. 22-3, ¶ 3.)  Ms. Phelps initially refused to compensate the police officers for the unpaid overtime they were owed under the FLSA, but ultimately complied once she was directed to do so in an executive session of the City Council.  (*Id*.)

Defendants note Ms. Phelps' initial refusal to comply with the FLSA by reimbursing police officers for unpaid overtime could have exposed the City to an action for liquidated damages for willful violation of the FLSA.  (Dkt. 22-1, p. 14) (citing 29 U.S.C. § 260).  Ironically, although she first identified the overtime violation, Ms. Phelps then attempted to pay the police department less than they were owed under the FLSA by initially refusing to compensate officers for their accrued overtime.  In a typical FLSA cases, a plaintiff advocates for unpaid wages or overtime on behalf of themselves or

26

others.  Here, with respect to both the accrued overtime and use of a 171 hour pay period instead of a 160 hour pay period, Ms. Phelps sought to pay the police department less wages than what they were owed under the FLSA.  Although she did so because she mistakenly believed the changes requested by the Mayor and City Attorney violated the FLSA, Ms. Phelps' conduct illustrates her interests were clearly aligned with protecting the City from liability, rather than its employees from underpayment.  Moreover, once Ms. Phelps raised the FLSA compliance issues to Mayor Telford and the City Attorney, both issues were quickly resolved.  Ms. Phelps testified in her deposition that all payroll issues and purported FLSA violations were resolved by April, 2013.  (*Id.*, p. 26; p. 95.)

The circumstances in this case contrast sharply with those the Ninth Circuit found created a genuine issue of material fact in *Rosenfield*.  First, Mrs. Phelps was tasked with preparing and approving payroll.  Ensuring payroll complied with applicable law can be presumed from this role.  Ms. Phelps also demonstrated maintaining compliance was a part of her position by reporting potential FLSA violations to Mayor Telford and the City Attorney, and then initially refusing to implement changes the Mayor and the City Attorney authorized because she believed the changes did not comply with the FLSA.  Ms. Phelps' detailed notes from the time period also suggest preserving compliance was a part of her position.  *See, e.g.*, (Dkt. 26-3, p. 15) (stating, "I was hired to fulfill my duties as Clerk and Treasurer.  My main objective has been to do my job the best I can, following the laws and policies of the City and State.")  Because Ms. Phelps was tasked with preparing payroll in accordance with the law, her reports regarding the City's failure to comply with the FLSA would not put Defendants on notice that Ms. Phelps was filing

a complaint within the meaning of § 215(a)(3).  Instead, reporting compliance issues was what Defendants expected of Ms. Phelps.

Moreover, unlike in *Rosenfield*, there is also no testimony in the record from any of the defendants, let alone from Mayor Telford, Ms. Phelps' boss, to suggest ensuring compliance with the FLSA was not Ms. Phelps' responsibility.  Instead, FLSA violations were corrected once Ms. Phelps reported them, illustrating Mayor Telford and the City Attorney relied upon Ms. Phelps to safeguard compliance.  Ms. Phelps did not have to complain again about the violations, and all compliance issues were resolved by April 2013.  Rather than being ignored and encouraged not to worry about compliance with the FLSA, as was the employee in *Rosenfield*, Ms. Phelps' complaints were immediately responded to and resolved.

Ms. Phelps' deposition testimony, notes and actions illustrate she was attempting to protect the City and to ensure its compliance with the FLSA, and was not asserting rights protected by the FLSA on her own or others' behalf.  Under such circumstances, Defendants did not have fair notice that Ms. Phelps was making a complaint that could subject them to a later claim of retaliation.  *Rosenfield*, 811 F.3d at 288; *see also McKenzie*, 94 F.3d at 1487 ("There is no evidence in the record to suggest that McKenzie was asserting any rights under the FLSA…rather, the record reflects that McKenzie's actions in connection with the overtime pay issue were completely consistent with her duties as personnel director for the company to evaluate wage and hour issues and to assist the company in complying with its obligations under the FLSA.").  Ms. Phelps

FLSA accordingly fails to establish the first element of a prima facie FLSA retaliation claim, that she engaged in a protected activity pursuant to § 215(a)(3).[13]

### 3. **Whistleblower Act Violation**

Ms. Phelps' third claim is for violation of the Idaho Protection of Public Employees Act (or "Whistleblower Act"), I.C. § 6-2101 *et seq*.  The Whistleblower Act "seeks to protect the integrity of the government 'by providing a legal cause of action for public employees who experience adverse action from their employer as a result of reporting waste and violations of a law, rule or regulation.'"  *Patterson v. State Dept. of Health & Welfare*, 256 P.3d 718, 724 (Idaho 2011) (quoting *Van v. Portneuf Med. Ctr.*, 212 P.3d 982, 987 (Idaho 2009) ("*Van I*").

To establish a prima facie case of retaliation under the Whistleblower Act, an employee must show: (1) she was an employee who engaged or intended to engage in protected activity; (2) her employer took adverse action against her; and (3) the existence of a causal connection between the protected activity and the employer's adverse action. *Van v. Portneuf Med. Ctr.*, 330 P.3d 1054, 1059 (Idaho 2014) ("*Van II*") (quoting *Van I*, 212 P.3d at 988).  Once an employee establishes a prima facie case for retaliation under the Whistleblower Act, this Court has previously held the *McDonnell Douglas* burden-

---

[13] Although the Ninth Circuit has held the issue of whether a complaint has been filed that provides adequate notice to the employer is a question "to be resolved as a matter of factual analysis on a case-by-case basis," the Court, as detailed above, concludes the undisputed facts establish Ms. Phelps did not file a complaint within the meaning of § 215(a)(3).  *Rosenfield*, 811 F.3d at 288.

shifting analysis applies at both the summary judgment and trial stage.  *Summers v. City of McCall*, 84 F.Supp.3d 1126, 1138 (D. Idaho 2015).

When the *McDonnell Douglas* analysis is applied to cases involving retaliation under the Whistleblower Act: (1) the plaintiff must establish a prima facie case of retaliatory conduct for an action protected by the relevant whistleblower statute; (2) once the plaintiff demonstrates a prima facie case, the defendant is obligated to produce evidence which, if taken as true, would permit the conclusion that there was a non-retaliatory reason for the adverse action; and (3) if the defendant articulates a legitimate non-retaliatory reason for the action, then the burden shifts to the plaintiff to prove by a preponderance of the evidence that the reason the defendant offers is a pretext for retaliation.  *See Curlee v. Kootenai Cnty. Fire & Rescue*, 224 P.3d 458, 463 (Idaho 2008); *Summers*, 84 F.Supp.3d at 1138.

Ms. Phelps alleges that she was a public employee who engaged in a protected activity by reporting purported FLSA violations to Mayor Telford and the City Attorney. Ms. Phelps claims Mayor Telford's failure to give her a raise and the City Council's vote against reappointment were retaliatory actions connected with her protected activity, and, therefore, in violation of the Whistleblower Act.  Defendants deny Ms. Phelps engaged in a protected activity and deny there is causal connection between her activity and the adverse employment actions.

The scope of protected activity under the Whistleblower Act is broader than that under the FLSA.  Based on the plain language of § 6-2104, Ms. Phelps is protected from communicating a violation or suspected violation of any state or federal law.  By contrast,

the FLSA limits "protected activity" to a clear "assertion of rights protected by the [FLSA] and a call for their protection." *Kasten*, 563 U.S. at 9.  Defendants acknowledge Ms. Phelps' reports of alleged FLSA violations would constitute a protected activity "if this Court ignores the fact that they were caused by her own failure to recognize the FLSA's requirements in reviewing and preparing payroll." (Dkt. 22-1, p. 18.)  However, under I.C. § 6-2104(1), "[a]n employer may not take adverse action against an employee because the employee . . . communicates in good faith the existence of . . . a violation or suspected violation of a law, rule or regulation adopted under the law of this state."  I.C. § 6-2104(1)(a).  A communication is made in good faith "if there is a reasonable basis in fact for the communication.  Good faith is lacking where the employee knew or reasonably ought to have known that the report is malicious, false or frivolous."  I.C. § 6-2104(1)(b).  The statute does not provide an employee is precluded from making a claim if their conduct caused the legal violation they later communicate, and Defendants have not cited any cases to suggest otherwise.

Moreover, whether Ms. Phelps communicated purported FLSA violations in good faith "is a question of fact, and summary judgment is appropriate only if, after viewing the evidence in the light most favorable to [the non-moving party], reasonable minds could only conclude that" the communication was malicious, false, or frivolous.  *Curlee*, 224 P.3d at 467.  Regardless of whether all of her complaints and actions were accurate, the Court finds a reasonable jury could conclude Ms. Phelps acted in good faith due to her belief the various overtime issues violated the FLSA.  Ms. Phelps survives summary judgment on the first element of Whistleblower Act claim.  *Id*. at 458 (genuine issue of

material fact as to whether employee of county fire and rescue acted in "good faith" in recording the allegedly wasteful activities of her coworkers precluded summary judgment in favor of fire and rescue).

Under the Whistleblower Act, causation is generally an issue of fact to be decided by a jury.  The Idaho Supreme Court has held, as a general rule, "causation is an issue of fact for the jury and only rarely can the issue be determined on a motion for summary judgment." *Van I*, 212 P.3d at 989. While Defendants claim there is no temporal connection to causally link Ms. Phelps' reports of purported FLSA violations and the denial of her raise, Ms. Phelps testified Mayor Telford told her she did not receive a raise because of the police department payroll problem.  (Dkt. 26-5, Phelps Depo., pp. 95-96.) Although Mayor Telford's disciplinary letter detailing the reasons for denying Ms. Phelps a raise suggests both the raise denial and her subsequent termination were not caused by the payroll issue, but were instead due to a number of performance issues unrelated to the FLSA, Ms. Phelps has established a genuine issue of material fact precluding summary judgment with respect to causation under the Whistleblower Act.  As such, the burden shifts to Defendant to produce evidence of a non-retaliatory reason for the adverse employment actions.

Mayor Telford's October 2013 disciplinary letter provides a number of non-retaliatory reasons for the decision to deny Ms. Phelps a raise and subsequent vote against Ms. Phelps' appointment.  The disciplinary letter lists multiple complaints with Ms. Phelps' performance, including:

32

- "Ms. Phelps has increasingly been difficult to work with.  Ms. Phelps needs to treat me and others in a polite, professional manner and not interrupt, argue or yell when she disagrees with whatever topic we are discussing."

- "I and several members of the City Council have received complaints that Ms. Phelps is unapproachable by the public and City employees.  Ms. Phelps needs to treat people who come into City Hall or call with respect and kindness no matter the situation."

- "More than one City Council member has informed me that they have had negative encounters with Ms. Phelps and feel she gives preferential treatment to one Council member over the others."

- "Ms. Phelps routinely complains about City contractors and employees, but when I investigate her complaints, I find them to be minor or warrantless."

- "Ms. Phelps must refrain from making derogatory and/or insubordinate comments regarding me, the City Council, City contractors, and City employees to persons outside of City Hall as such action is counter to the personnel policy manual.  Ms. Phelps needs to create a positive atmosphere at City Hall instead of the combative, negative one that exists.  Ms. Phelps' silent treatment must also stop."

(Dkt. 22-5.)

The aforementioned performance issues are corroborated by the deposition testimony of the defendant City Council members.  For instance, Smith testified that he had been told by several City employees, including the Supervisor of City Employees and

one of his employees, as well as several police officers, that they avoided City Hall whenever Ms. Phelps' car was parked in front.  (Dkt. 22-13, Smith Depo., pp. 14-15, pp. 22-25.)  Smith said he had personally viewed Ms. Phelps "being moody."  (*Id*., p. 27.)  When pressed for an example, Smith stated "[a]s people came in to pay their—they pay their water bills in there.  She rolls her eyes if she has to get up from her desk and help someone."  (*Id*., pp. 27-28.)  Smith confirmed he also avoided paying his water bill if Ms. Phelps was present because "[i]nterrupting [her] work would—you could tell that she— you could tell how she felt about people coming in and having to get up and help them." (*Id*., p. 38.)  Smith also recounted a conversation he had with Angie Mejia, Ms. Phelps' assistant, when Mejia was crying and threatening to leave her position.  When Smith questioned her, Mejia stated "[t]hat sometimes [Ms. Phelps'] was so rude and mean to her that she just couldn't stand it anymore."  (*Id*., p. 33.)  Mejia also claimed Ms. Phelps "didn't give her a raise one year because she was too nice to people who came in the office."  (*Id*., pp. 33-34.)  Smith confirmed with Mayor Telford that the latter statement was true.  (*Id*.)

Eguia testified he voted against Ms. Phelps' reappoint because "of her actions, complaints, things that were being said around town that I heard that were not happy with—any time they had to deal with her, they weren't happy."  (Dkt. 22-11, Eguia Depo., p. 16.)  When asked for a specific example of complaints he had heard about Ms. Phelps, Eguia stated, "[s]he was just very difficult at times to work with, to deal with from the constituents, whether it was a customer complaint and the way she handled it…just the way [she] dealt with people."  (*Id*., pp. 17-18.)

34

Lee testified she voted against appointing Ms. Phelps because whenever "she was asked to do things, she wouldn't do them.  For instance, we wanted to get the City to be able—for the customers to be able to pay with a credit card, and with a card machine. She said she wouldn't do it.  She refused to do a lot of things she was asked to do."  (Dkt. 22-12, Lee Depo., p. 30.)  Lee also stated Ms. Phelps was impolite and had been rude to her on an occasion when Lee went to City Hall.  (*Id.*, pp. 30-31.)

Based on the foregoing, the Court finds Defendants have provided evidence that the reason for the adverse employment actions was Ms. Phelps' inability to work with City employees and the public.  Because Defendants have established a legitimate, non-retaliatory reason for the raise denial and vote against reappointment, the burden shifts back to Ms. Phelps to prove by a preponderance of the evidence that the reason advanced by the Defendants was a pretext for retaliatory conduct.  The Court finds Ms. Phelps has not met her burden on this claim.

Pretext can be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Dawson v. Entek Intern.*, 630 F.3d 928, 935 (9th Cir. 2011).  The Ninth Circuit has held that a plaintiff at the pretext stage must produce evidence in addition to that which was sufficient for her prima facie case in order to rebut the defendant's showing.  *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).  In cases where a prima facie case consists of "no more than the minimum necessary to create a presumption of [retaliation] under *McDonnel Douglas*, plaintiff has failed to raise a triable issue of fact." *Id.*

Ms. Phelps argues pretext is established because Mayor Telford directly told her she was not getting a raise due to payroll issues.  Although this is a factual issue, Ms. Phelps must offer evidence in addition to that which was sufficient for her prima facie case in order to rebut Defendants' showing.  *Id.; see also Godwin v. Hunt Wesson, Inc*., 150 F.3d 1217, 1220 (9th Cir. 1998).

Ms. Phelps claims pretext is also established because her "alleged performance issues are directly contradicted by the exemplary comments Mayor Telford provided on all of her previous evaluations."  (Dkt. 26, p. 19.)  While there are many positive comments in the evaluations, the negative statements contained therein significantly corroborate the allegations in the disciplinary letter and testimony of the City Council regarding Ms. Phelps' poor attitude.  Specifically, the evaluations state Ms. Phelps did not handle stress well, had a problem with yelling, and was often moody.  (Dkt. 26-3, Exhibit S).  The evaluations do not create a genuine issue of material fact because they in fact support Defendants' proffered legitimate, non-retaliatory reason for the adverse employment actions.

Finally, Ms. Phelps submits an affidavit from Mayor Flowers stating he did not receive similar complaints about Ms. Phelps when he was her supervisor.  (Dkt. 27.) Mayor Flowers' declaration relates to his previous time as Mayor from 1996 to 2004, and is too far attenuated from the time at issue in this suit, many years later, when Mayor Telford and the City Council experienced problems with Ms. Phelps, to establish a genuine issue of material fact in support of pretext.

Based on the foregoing, the Court finds Ms. Phelps has failed to show that a genuine issue of material fact exists as to whether the purported reason for the adverse employment actions was pretext for the Defendants' retaliation against Ms. Phelps because of the payroll issue.  Accordingly, the Court will grant the Motion for Summary Judgment on this claim.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED**:

1.  Defendants' Motion for Summary Judgment (Dkt. 22) is **GRANTED**. [14]  This case is accordingly dismissed with prejudice.

DATED: March 31, 2016

Edward J. Lodge
United States District Judge

---

[14] Given this ruling, the Court need not address either Defendants' argument regarding the necessity of a bond under I.C. § 6-610(2) or the purported limitation of remedies available under the Whistleblower Act.